IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


GRETCHEN C. NEUMANN                                    PLAINTIFF


        v.           Civil No. 05-5155

JOHN E. POTTER, POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE                           DEFENDANT

O R D E R

Now on this 2nd day of May, 2007, come on for consideration defendant's **Motion For Judgment As A Matter Of Law, Or In The Alternative, For A New Trial** (document #45), and defendant's **Motion For Leave To File Reply** (document #51), and from said motions, and the response thereto, the Court finds and orders as follows:

1.  Plaintiff Gretchen Neumann ("Neumann") brought suit against John E. Potter, Postmaster General of the United States Postal Service, alleging that agents of the Postal Service had subjected her to retaliation and a hostile work environment. The Court broke Neumann's claims down into three categories, which it followed in instructing the jury:

*   the Discrete Act of Retaliation Claim, a contention that Neumann's supervisors retaliated against her for engaging in protected activity by unduly delaying placing her in a new Level 6 position after her old position was abolished;

*   the Hostile Environment Retaliation Claim, a contention

that Neumann's supervisors retaliated against her for
engaging in protected activity by subjecting her -- or
allowing other employees to subject her -- to a hostile
work environment; and

* the Gender Harassment Claim, a contention that Neumann
was subjected to discrimination in the form of gender
harassment by a co-worker.

At trial, the jury returned a verdict in favor of defendant
on Neumann's Discrete Act of Retaliation Claim. The jury returned
a verdict of $50,000 in favor of Neumann on her Hostile
Environment Retaliation Claim, and a verdict of $50,000 in favor
of Neumann on her Gender Harassment Claim.

2. Defendant now moves for judgment as a matter of law in
his favor on the claims upon which Neumann prevailed, or, in the
alternative, a new trial. He also moves for leave to file a reply
brief. The Motion For Leave To File Reply will be granted.
Defendant need not file an additional copy of his reply brief, as
the Court has read and fully considered the copy attached to his
Motion.

3. Motions for judgment as a matter of law are governed by
**F.R.C.P. 50**. The Eighth Circuit has prescribed a rigorous
standard of review on such a motion:

We view the evidence in the light most favorable to the
nonmovant, give it the benefit of every reasonable
inference, and resolve all factual disputes in its
favor. If the evidence viewed according to this

-2-

standard would permit reasonable jurors to differ in the conclusions they draw, judgment as a matter of law cannot be granted.

**Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.**, **477 F.3d 583 (8th Cir. 2007).** The Court is directed to "avoid[] making credibility assessments or weighing the evidence." **Synergetics, Inc. v. Hurst**, **477 F.3d 949, 956 (8th Cir. 2007).**

When a judgment as a matter of law is granted after a jury verdict, the Court may either direct the entry of the appropriate judgment, or grant a new trial. **F.R.C.P. 50(b).** Because the basis of defendant's request for a new trial is the alleged excessiveness of the damages award, it appears that the availability of a new trial as a form of relief under **Rule 50**, rather than the provisions of **F.R.C.P. 59**, is the basis for defendant's alternative request of a new trial. The Court will, therefore, analyze the motion simply as one for judgment as a matter of law.

4.    Defendant contends that there was insufficient evidence to support the jury's verdicts in favor of plaintiff, and that the damages are excessive. He also renews his argument that plaintiff failed to exhaust her administrative remedies.

5.    Neumann first resists defendant's motion by contending that defendant failed to properly preserve the issues as to sufficiency of the evidence when he made his pre-verdict motion for judgment as a matter of law. **F.R.C.P. 50(a)(1)** provides:

-3-

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party of that issue, the court may . . . grant a motion for judgment as a matter of law against the party. . . .

A motion for judgment as a matter of law "must specify the judgment sought and the law and fact that entitle the movant to judgment." **F.R.C.P. 50(a)(2)**.

The rule is applied somewhat leniently:

> a post-trial motion for judgment as a matter of law may not raise additional grounds that the party did not raise in a pre-verdict motion, [but] the grounds are considered to be sufficiently raised if the district court and the nonmoving party are apprised of the basis for the motion. Technical precision in stating the grounds for the motion is not necessary.

**Okruhlik v. University of Arkansas**, 395 F.3d 872, 878, fn 5 (8th Cir. 2005)(internal citations omitted). The Court does not take this leniency to be such as to do completely away with the rule, however.

The transcript of defendant's pre-verdict motion for judgment as a matter of law shows that defendant asserted that the evidence of "isolated incidents of particular employees" and "harassment from co-workers who are not in supervisory positions" was insufficient to constitute "actionable retaliation," and that there was no evidence that failure to immediately place plaintiff in a Level 6 job, or to commence her training promptly when she was put in a Level 6 job, "was done with any type of motive of retaliation or harm to her." Defendant further asserted that this

-4-

conduct "could not be deemed sufficiently severe or pervasive to alter the terms and conditions" of plaintiff's employment.

The Court finds that defendant fairly raised the issue of sufficiency of the evidence as to Hostile Environment Retaliation Claim by these arguments.  However, defendant's arguments to the contrary, the Court does not find that the pre-verdict motion for judgment as a matter of law fairly raised the issue of sufficiency of the evidence as to the Gender Harassment Claim.  The arguments went specifically to those concepts subsumed in the terms "retaliation" and "hostile environment," and did not in any way address "gender."

The Court will, therefore, deny defendant's Motion For Judgment As A Matter Of Law as it pertains to sufficiency of the evidence on the Gender Harassment Claim, because defendant failed to properly preserve that issue.

6.    Turning to the issue of the sufficiency of the evidence to support the Hostile Environment Retaliation Claim, the legal rule is that to establish a *prima facie* case of retaliation, a plaintiff has to show that she engaged in protected activity, that she suffered an adverse employment action, and that there was a causal connection between the two.  The defendant then may rebut the *prima facie* case by offering a legitimate, non-retaliatory reason for the adverse action, following which case the plaintiff must demonstrate that this reason is pretextual.  **Shanklin v.**

**Fitzgerald**, 397 F.3d 596, 603 (8th Cir. 2005).

> The anti-retaliation provisions of Title VII make it
>
> an unlawful employment practice for an employer to
> discriminate against any of his employees or applicants
> for employment . . . because he has opposed any practice
> made an unlawful employment practice by this subchapter,
> or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

**42 U.S.C. §2000e-2(a).**

This provision protects an employee "not from all retaliation, but from retaliation that produces an injury or harm. . . . a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." **Burlington Northern and Santa Fe Railway Co. v. White**, 126 S.Ct. 2405, 2414-15 (2006).  While the assignment of job duties is not automatically actionable, retaliatory work assignments are a classic form of forbidden retaliation. **Id.**, 2045 at 2416-17.

A review of the exhibits and testimony that have been placed before the Court in connection with the Motion For Judgment As A Matter Of Law, viewed in the light most favorable to the nonmovant, Neuman, reflects the following:

> \* Neumann started working for the Postal Service in 1994,
>   sorting mail.  Between 1995 and 1998, she filed 22 EEO
>   complaints, relating variously to working conditions,
>   overtime, training, leave, promotion, and assignment of
>   duties. These cases were eventually consolidated, and

were resolved favorably to Neumann in mid-1999.

* In April, 2002, Neuman became what is known as an "unassigned regular" when her Level 6 job with the Postal Service was eliminated by automation. While Neumann could have bid for a job at a Level 5 position[1], she was not required to do so, and chose not to do so. She chose, instead, to retain her Level 6 classification, pay, and benefits, while waiting for a Level 6 job to become available.

* Under the terms of a Memorandum of Understanding ("MOU") between the Postal Service and the American Postal Workers Union (the "Union") related to the automation, if there were insufficient same or higher level job vacancies to accommodate employees displaced by automation, "preference eligible employees" were to be placed first into same or higher level vacancies as they occurred. If a vacancy in a lower-level job occurred, the junior non-preference eligible employee from the same level as the preference eligible employee was to be moved into the lower level position, thus making a place at the higher level for the preference eligible employee. This practice was referred to as "bumping" the junior employee.

---

[1]Level 6 jobs paid more, required more skill, and had less supervision than Level 5 jobs.

-7-

* As of April 20, 2002, Neumann was the senior preference eligible employee displaced by automation in the Fayetteville plant.  The junior non-preference eligible employee at Level 6 was Virginia Hickman, the Business Mail Entry Unit ("BMEU") clerk.

* Neumann's immediate supervisor was Gary Noe.  Noe was aware that Neumann had filed "quite a few" EEO complaints since 1997.  In fact, Noe, along with another supervisor, Mark Bush, had been named in some of those complaints.  Neumann had also named Noe in a complaint to the National Labor Relations Board in 1998.  However, after the consolidated case was resolved in 1999, Neumann did not file any other EEO complaints until the one that resulted in the case at bar, and she had "worked hard to restore a positive relationship" with Noe.

* When she became an unassigned regular, Neumann no longer "owned" a job position, but was at the mercy of her supervisor as to her daily assignments. She was given her work assignments by Noe.

* Neumann asked Noe to place her in Hickman's Level 6 job, but this did not happen.  Noe also ignored Neumann's requests to be placed temporarily in Level 6 jobs for which she was qualified, when a temporary person was

needed in those jobs. On at least one occasion Noe assigned a Level 5 employee to fill in for a Level 6 employee, and assigned Neumann to do the Level 5 employee's job.

* Noe frequently assigned Neumann to work with Jim Warford, a slow worker who made a lot of mistakes. Male employees had been assigned to help Warford in the past, without incident, but Neumann's experiences with Warford were unpleasant and led to Neumann asking for intervention from Noe and his superiors on several occasions.

* Because Noe did not place her in a Level 6 job, Neumann sought help from the Union. Hickman, however, was an officer in the Union, and Neumann was not even a member. The Union was not helpful in Neumann's quest to be placed in Hickman's job.

* On December 7, 2002, Neumann sent Plant Manager Gary Blackburn, Noe's supervisor, a letter complaining of what she perceived as a "veiled threat" by a former employee, Fred Cusanelli, who had figured centrally in her EEO complaints in the 1990s. She noted that Cusanelli had been to the plant several times "socializing with his union cronies," and had asked another employee to let Neumann know "that Mr. Cusanelli

had received his weapons permit and would now be carrying a gun on his person." She asked that Cusanelli not be allowed on the premises, since the workplace was not a customer service facility and Cusanelli was not an employee. Blackburn did not respond to this letter.

*   In February, 2003, Mark Bush became Plant Manager. Neumann asked Noe to set up a meeting with Bush about her job, but got no response.

*   In early May, 2003, Neumann "caught" Bush -- who worked a different shift --  in the supervisor's office and asked if they could talk about the MOU and Neumann getting Hickman's job. Bush said he did not have time to talk then, but that they could meet "in the future sometime." No future date was set and Bush did not re-contact Neumann.

*   A few weeks later Neumann again "caught" Bush in the supervisor's office, and he said he would set up a time to talk with her, but again, he did not do so.

*   At the end of May, 2003, Neumann finally persuaded Bush to talk with her about her job assignment. Bush read the MOU, said it sounded like Neumann should have an assigned Level 6 position, and that he would "check with his labor people in Little Rock"[2] and get back with her.

---

[2]Regional headquarters for the Fayetteville offices were located in Little Rock, Arkansas.

He did not get back with her.

* On June 17, 2003, Neumann again "caught" Bush in the supervisor's office, and asked what was going on with her job. Bush told her "you're not going to get a Level 6 position. You'll just have to talk to someone in Little Rock about it." Bush would not identify who, in Little Rock, Neumann needed to talk to.

* On June 18, 2003, Neumann sent Bush a letter, asking him to state in writing his reasons for his "decision to interpret the MOU" in such a way as to not allow "bumping." Bush did not respond to the letter. Sometime in July, Bush left the position of Plant Manager.[3]

* On September 30, 2003, Neumann sent a letter to Acting Plant Manager David Fisher, indicating that she had information that a coworker, Charlie Hoag, might be stalking her. She also stated that "supposedly" Hoag and Warford were "'watching my every move' and recording my breaks and other details about my workday and work habits." She indicated that since she had become an unassigned regular, she had had "behavioral problems" with both Hoag and Warford, and asked that the situation

---

[3]There was testimony to the effect that between 1997 and 2002, the facility where Neumann worked had ten to twelve different Acting Plant Managers. The reasons for this continual turnover were not explored.

be investigated and a "permanent stop" be put to it.

* Fisher, however, did not investigate -- or follow up -- the complaints in Neumann's September 30, 2003, letter. He merely passed the letter down to Neumann's supervisor Noe, and heard no more about it.

* The Postal Service promulgates a Manager's Guide To Understanding Sexual Harassment, which contains detailed guidelines for dealing with employee complaints about conduct that might be considered sexually harassing. The process contemplates that "managers, postmasters, and supervisors to whom a complaint is brought" will conduct an investigation, or if they do not "have the necessary authority to launch an inquiry, they must bring the complaint to the attention of a higher level supervisor or manager who does."  The Manager's Guide also directs a manager to "[f]ollow up to ensure that harassment does not continue and that retaliation does not occur," and provides that "[a] manager who fails to fulfill his or her obligation under Postal Service policy to address harassment claims may also be found to have retaliated against an employee because of the adverse effect of that willful indifference."

* The Manager's Guide notes that "hostile environment claims can encompass harassing behavior that is not

necessarily sexual in nature.  For example, it can be sexual harassment to single out one sex with acts of aggression, intimidation, hostility, rudeness, name calling, or other types of abusive conduct."

* When Noe got Neumann's September 30, 2003, letter, he talked to Hoag, but not to Warford or Neumann, nor to a third employee identified in the letter.  He discounted Neumann's concerns as hearsay, focusing on her use of the word "supposedly."  Noe's marginal inquiry does not fulfill the requirements of the Manager's Guide, which directs managers to "[t]ake every incident or complaint seriously."  The Manager's Guide contains a detailed set of instructions, including guidelines and checklists, for interviewing (a) complainants, (b) those alleged to have harassed them, and (c) witnesses.  It specifically directs managers to "[i]nterview the alleged harassee."

* On September 22, 2003, Neumann sent a letter to Noe and Fisher, stating that it had come to her attention that a Level 6 Clerk position would be vacated as of October 3, 2003, and that she would like to be placed in this position.  She was not placed in the position.

* At some point in this series of events (the Court has not been able to ascertain the precise date from the evidence adduced in support of the motion), Neumann met

-13-

with Acting Postmaster Sandy Woodburn and Noe about Neumann's problems with Warford.  Neumann described her problems with Warford, including Warford's statement that he "has such a hard-on for me he doesn't have enough skin left to blink his eyes."  The Postmaster told Neumann she needed to take the matter up with her supervisors, and Neumann responded that she had already taken it up with them, and they had not done anything. Noe said nothing.  The Postmaster then told Neumann that the meeting was over, and that Neumann would "just have to file an EEO, or whatever you have to do." The Manager's Guide specifically instructs managers not to "dismiss employees by telling them to file an EEO complaint or a grievance.  You must manage the problem yourself, even if the employee also chooses to file a grievance or an EEO complaint."

*    On October 6, 2003, Neumann filed the EEO complaint that led to the case at bar.

*    On October 27, 2003, Fisher sent Neumann a letter stating that she was to be placed in Hickman's "BMEU position" when she successfully completed the required training.  This assignment caused a grievance to be filed by Hickman.

*    Neumann did not actually get to start either the BMEU

-14-

position or training for it until April, 2004. This was contrary to customary practice, pursuant to which an employee assigned to a new position was allowed to start work in the new position before training so as to become familiar with the position. It was also not normal for an employee to have to wait six months before getting trained for a newly assigned position.

* On November 14, 2003, Neumann sent a Freedom of Information ("FOI") request to Acting Plant Manager Roger Nichols, requesting copies of "any and all communication on the subject of my being assigned to the BMEU position and/or the subject of the incumbent employee losing her right to the position." Nichols did not respond to this letter.

* On November 17, 2003, Neumann sent a letter to Noe, again complaining of harassment by Warford. This letter was triggered by an incident between Warford and another female employee, Karen Widick, but it focused almost totally on Neumann's own problems with Warford. Neumann noted that she had "been an ongoing target of [Warford's] bad attitude and hostility for the past year," and that she was "apprehensive . . . all night every night[4] working anywhere near [Warford] because I

---

[4]Neumann worked the night shift.

-15-

am afraid of being targeted in some way, possibly physically." She noted that Noe was "fully aware because he has come to you and other supervisors to constantly complain about what or where I am working or trying to 'bump' me, he seems to particularly blame me for many of his problems since I became an unassigned regular and began 'stealing' his overtime and 'doing his job'." The letter recited a litany of problems Neumann had encountered with Warford over the past year, and concluded with the request that the Postal Service "do something constructive to educate this guy about the professional standards we are all expected to adhere to in our workplace."

* When Noe got Neumann's November 17, 2003, letter, he interviewed Widick, Warford, and a third employee, Emmett Biswell, but he did not interview Neumann. Although he concluded that Warford was creating a hostile environment, he continued to assign Neumann to help Warford do his job.

* On November 21, 2003, Neumann sent a letter to Nichols, stating that "[i]n the past year I have constantly complained about personal harassment and targeting by at least one fellow employee to three supervisors, two plant managers and a postmaster. So far I have seen

nothing much done about it to prevent it from recurring, and it does continue to reoccur." The letter stated that the problem started when Neumann became an unassigned regular, and detailed some of the problems Neumann had experienced. It concluded by asking "[w]hat exactly do I have to do to be allowed to come in here and do my work without disruption from all this nonsense and 'angst' and just go home at the end of the day? Why can't I get any officials to document and deal with constructively the issues I repeatedly identify as causing disruptions to my environment and productive work?"

* Nichols did not investigate Neumann's November 21, 2003, letter, as he was required to do pursuant to the Manager's Guide. He testified that he would only involve himself in such investigation if it was something "immediate and extremely serious." For "something that's been going on for awhile, like this, I would have the supervisor investigate it." Nichols sent Neumann's letter to Noe, and did not follow up.

* On January 26, 2004, Neumann sent Nichols a second FOI request, asking for "any and all information and grievances submitted in regard to or in any way related to my being assigned to the BMEU position or Virginia

-17-

Hickman's being removed from the BMEU position."
Nichols did not respond to this letter.

* On February 5, 2004, Neumann sent a letter to Nichols,
noting that she had not had an "assigned schedule" in
over a year and a half, and that she was an unassigned
regular awaiting training for the BMEU position.  She
asked for a schedule change so that she could
familiarize herself with the BMEU position, and stated
her belief that the employee who currently held the
position "was placed in the office several weeks or
months before her schooling and tests."  She received no
response to this letter.

* On March 12, 2004, Neumann sent a letter to E.W.
Waldemayer, the Postal Service Regional Director in
Little Rock, Arkansas.  In the letter, Neumann stated
that she had made several FOI requests that had gone
completely unacknowledged, and that the requests related
to an employee grievance over her placement in the BMEU
position.  She noted that "I have been fighting for this
MOU to be enforced for nearly two years.  During that
time I have been working completely out of schedule. .
. . I am currently awaiting a change of schedule and
assignment to BMEU school in Norman, OK."  She
reiterated the FOI requests made to her Plant Managers.

-18-

Waldemayer did not respond to this letter.

\*     On April 19, 2004, Neumann finally received her change
      of schedule for the BMEU position.

When this evidence is viewed in the light most favorable to
Neumann, and given the benefit of all favorable inferences, the
Court believes that, while reasonable jurors could differ in the
conclusions to be drawn from it on Neumann's Hostile Environment
Retaliation Claim, it could support a verdict in her favor.
Defendant's contentions to the contrary are that Neumann failed to
prove that she experienced a hostile work environment, and that
Neumann's protected activity -- the filing of the EEO complaints
in the late 1990s -- is too remote in time to form the nexus
required to prove retaliation.

(a)  As to the hostility of Neumann's environment, defendant
contends that it was nothing more than unpleasant conduct and rude
comments of co-workers, insufficient as a matter of law because
not so severe and pervasive as to alter the conditions of her
employment.

In **Harris v. Forklift Systems, Inc.**, **510 U.S. 17 (1993)**, the
Supreme Court outlined what constitutes a hostile environment,
admittedly not "a mathematically precise test," thus:

> [W]hether an environment is "hostile" or "abusive" can
> be determined only by looking at all the circumstances.
> These may include the frequency of the discriminatory
> conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive
> utterance; and whether it unreasonably interferes with

an employee's work performance.    The effect on the
employee's psychological well-being is, of course,
relevant to determining whether the plaintiff actually
found the environment abusive.  But while psychological
harm, like any other relevant factor, may be taken into
account, no single factor is required.

**510 U.S. at 23**.    The conduct must be both objectively and

subjectively perceived as creating a hostile environment.  **510**

**U.S. at 21**.

When examined in light of the factors in **Harris**, the Court

finds the evidence weighs in favor of a finding that Neumann's

work environment was a hostile one:

*    The abusive conduct was frequent.    Noe directed

Neumann's activities on a daily basis, since she had no regular

job assignment.   Thus he had the opportunity to take hostile

action against her every day for two years.  He exercised this

opportunity frequently by making Neumann work with Warford,

knowing that Warford was creating a hostile environment for

Neumann.   He refused to place Neumann in Level 6 temporary

positions even when they became available.  He refused to fairly

investigate Neumann's complaints about Warford and Hoag.

*    The conduct was at times severe.   Noe and his

supervisors refused to give Neumann any information or guidance or

assistance in implementing the MOU, and Fisher, Woodburn, and

Nichols refused to address Neumann's concerns when she attempted

to bypass Noe after Noe failed to respond to her complaints about

Hoag and Warford.   Neumann was essentially left with nowhere to

turn for help with the situation in which she found herself.

* The conduct had a physically threatening component. Co-workers passed on a threat from Cusanelli about being armed -- a physically threatening situation in an era when "going postal" had become a part of the national vocabulary. Blackburn ignored Neumann's concerns about Cusanelli. Co-workes passed on threatening information about Hoag and Warford stalking Neumann. Fisher and Noe ignored Neumann's concerns about Hoag and Warford. Neumann worked the night shift with Union workers unfriendly to her over the Hickman situation, and with Warford, and Noe continued to assign Neumann to work with Warford even after she informed him that she was afraid Warford might physically harm her.

* It also had a humiliation component. Noe on at least one occasion allowed a Level 5 employee to fill in for an absent Level 6 employee, and required Neumann to fill in for the Level 5 employee. She was also given the "silent treatment" with regards to almost every attempt to get information from her superiors, including requests specifically made pursuant to federal statute, the FOI request.

* The conduct unreasonably interfered with Neumann's ability to work. She was forced to deal with problems from Warford and Hoag; worry about Cusanelli; and cope with Union members angry about Hickman's job loss. She was forced to work at

a lower level job, and thus not to her full potential.

* It affected Neumann's psychological wellbeing -- to the extent that she spent over $2,000 on mental health care.

Reasonable jurors could certainly conclude that Neumann subjectively considered her working environment hostile.  In addition, the Court finds the environment described by the evidence to have been objectively a hostile one.  The Court believes that a reasonable employee would consider the treatment to which Neumann was subjected to create a hostile work environment.

(b)  With regard to the nexus between protected activity and adverse employment action, defendant relies on the statement in **Shanklin** that "[s]tanding alone, a longer time gap between the protected activity and the adverse employment action weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint," and that with a ten-month delay, "any causal nexus inference tends to evaporate."  **397 F.3d at 604** (citation and internal quotation marks omitted).

While this is a correct statement of the law, Neumann's filing of EEO complaints does not "stand alone" as her only basis for demonstrating a nexus between protected activity and adverse employment action. It stands in the context of several significant events:

* Neumann's protected activity involved complaints against

-22-

the very person who was on the front line in carrying out the retaliatory conduct of which she complains, Noe.

*   Noe's treatment of Neumann took on a retaliatory cast at precisely the time that Neumann moved from a regular position that required little supervision, to one where Noe had the power to send her to different job duties and stations on a daily or even an hourly basis, thus acquiring significant power to manipulate her job environment.

*   It also coincided with Neumann's unenviable (but legitimate) request to bump another employee -- a situation tailor-made to create dissension in the workplace which would provide cover and support for Noe's retaliatory conduct.

*   During a significant portion of the time these events were transpiring, Noe's immediate superior was Bush, who had also been a target of Neumann's earlier protected activity.  When he became Plant Manager, Bush was not only in a position of power over Neumann, but in a position to aid and abet Noe.

*   When Neumann tried to bypass Noe and bring her complaints to Plant Managers other than Bush, those Plant Managers simply referred the complaints back to Noe -- although that was not appropriate under the Manager's Guide -- thereby preventing Neumann from escaping from Noe's power over her.

Thus, rather than "standing alone," the EEO complaints which a jury could readily find gave Noe the inclination to retaliate

against Neumann are coupled with job circumstances which gave him a particularly fertile opportunity to retaliate.

In addition, the Court notes that in **Shanklin**, "[t]he lack of causal connection is reinforced by the undisputed evidence of Shanklin's failure to meet [her employer's] expectations." Neumann, by contrast, was considered an excellent employee, even by Noe and Bush.

For these reasons, the Court is persuaded that Neumann has advanced sufficient evidence of a hostile work environment, and a causal connection between her protected activity and the retaliation which allowed that hostile environment to flourish, to support the jury's verdict. Defendant's motion for judgment as a matter of law on the issue of sufficiency of the evidence to support the Hostile Environment Retaliation Claim will, therefore, be denied.

7. Defendant also contends that the damages awarded to Neumann are excessive. He contends that Neumann needed mental health care before she was harassed and subjected to retaliation, and that the harassment and retaliation were not severe or pervasive enough to warrant the sums awarded. Defendant reasons that if the harassment had been severe, it would have been witnessed by coworkers, and that if it had been pervasive, Neumann would have bid on a Level 5 job to escape it.

The Court rejects out of hand the notion that because a

-24-

plaintiff has needed mental health care in the past, she could not have suffered mental anguish or emotional distress as a result of present conduct. Merely to state the proposition is to demonstrate how unsupportable it is.  If anything, a person who has had mental health issues in the past might be more fragile, more susceptible to such injuries, than a person who had always experienced robust mental health.

The evidence from Neumann's mental health care professional in this case supports a finding that she did, in fact, experience mental anguish or emotional distress as a result of the course of events outlined in ¶6, and Neumann testified that she spent over $2,000 obtaining such care.

The contention that if the harassment had been severe it would have been witnessed by coworkers is considerably undermined by the testimony of Noe, that "usually when we get situations in the postal service, nobody wants to give you a statement.  Even if they're a witness, they don't want to give statements.  They don't want to, you know, be involved . . . ."  It is also weakened by the reasonable supposition that an employee would avoid violating "zero tolerance" workplace policies in front of adverse witnesses.

Finally, there is the surprising contention that if the harassment had been really pervasive, Neumann would have bid on a Level 5 job to escape it.  That is tantamount to saying the solution for employment discrimination is to get a new job -- a

-25-

notion that runs completely contrary to Title VII.  Neumann was
not required to seek out a different job, much less one with less
prestige, autonomy, or responsibility, to escape harassment or
retaliation.   It was the obligation of the Postal Service to
investigate her complaints, and put a stop to the conduct giving
rise to them.

"A verdict is not excessive unless the result is monstrous or
shocking."  **Thorne v. Welk Investment, Inc.**, **197 F.3d 1205, 1212
(8th Cir. 1999)**.  Here, Neumann proved up over $43,000 in wages
that she was entitled to be paid for "out of schedule" work, and
over $2,000 expended for mental health care for stress related to
her job situation.  She endured a two-year course of retaliation,
during which her superiors allowed her to languish in a position
where she was frequently required to work with a coworker who
sexually harassed and possibly even stalked her.  At all levels
they ignored her requests for assistance and information.  A
damages award totaling $100,000 for this experience does not shock
the conscience of the Court.

8.   Defendant makes two arguments in his Motion For Judgment
As A Matter Of Law that essentially ask the Court to revisit its
ruling, in connection with a motion for summary judgment, on
aspects of administrative exhaustion.  These issues were fully
explored in connection with the motion for summary judgment, and
defendant offers no persuasive reason why the Court should

reconsider its earlier decision.  The motion will be denied as to
those issues.

     **IT IS THEREFORE ORDERED** that defendant's **Motion For Judgment
As A Matter Of Law, Or In The Alternative, For A New Trial**
(document #45) is **denied.**

     **IT IS FURTHER ORDERED** that defendant's **Motion For Leave To
File Reply** (document #51) is **granted.**

     **IT IS SO ORDERED.**

                          **/s/ Jimm Larry Hendren**
                        **JIMM LARRY HENDREN**
                        **UNITED STATES DISTRICT JUDGE**